UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
INNER CITY PRESS/COMMUNITY ON THE MOVE, :      04 CIV. 8337 (DLC)
                                        :
                    Plaintiff,          :      OPINION & ORDER
                                        :
          -v-                           :
                                        :
BOARD OF GOVERNORS OF THE FEDERAL       :
RESERVE SYSTEM,                         :
                                        :
                    Defendant.          :
----------------------------------------X

Appearances:

For plaintiff:
Richard McKewen
David C. Vladeck
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, Suite 312
Washington, D.C. 20001

For defendant:
Katherine H. Wheatley
Yvonne F. Mizusawa
Board of Governors of the Federal Reserve System
20th & C Streets, N.W.
Washington, D.C. 20551

DENISE COTE, District Judge:

     This Opinion considers defendant's summary judgment motion
and plaintiff's cross-motion regarding plaintiff's request under
the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, for a
document submitted to the Board of Governors of the Federal
Reserve System (the "Board") by Wachovia Corporation ("Wachovia")
and SouthTrust Corporation ("SouthTrust") as an exhibit to a
merger application.  For the reasons described below, both
motions are granted in part.

The following facts are undisputed unless otherwise noted. Plaintiff Inner City Press/Community on the Move ("ICP") is a nonprofit organization headquartered in the South Bronx. According to the declaration of its executive director, Matthew Lee ("Lee"), ICP engages in advocacy on issues affecting low-income consumers and communities. Among the organization's areas of concern is subprime lending at high interest rates to people with poor or unestablished credit histories. Subprime lenders include payday lenders, pawn shops, and subprime mortgage lenders. In the past, ICP discovered an instance in which a prominent bank was paying its staff referral fees to send borrowers to an affiliated subprime lender for higher-interest loans, and another in which a subprime lender affiliated with a prominent bank was charging minority customers higher interest rates than other customers with similar credit histories. In both cases, the publicity spurred by ICP's investigations was instrumental in convincing the lenders to change these practices. ICP often submits public comments regarding banks' subprime lending practices to the Board during the notice-and-comment period that follows the submission of a bank merger application.[1]

---

[1]Bank combinations and other ownership transactions meeting certain criteria must be approved by the Board pursuant to the Bank Holding Company ("BHC") Act, 12 U.S.C. § 1842. Under the Community Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901-2908, when the Board examines a financial institution, it shall "assess the institution's record of meeting the credit needs of the entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution." Id. § 2903(a)(1). ICP premises its comments on

ICP claims that its comments have caused at least one bank to commit to stop lending to payday and car title lenders pursuant to its merger with another bank.

On July 9, 2004, Wachovia and SouthTrust submitted a merger application to the Board (the "Merger Application").  In Wachovia's cover letter of the same date, it requested confidential treatment for certain "Confidential Volumes" that include the disputed exhibit.  In a letter of July 19, 2005, Lee made a FOIA request on behalf of ICP seeking the Merger Application and related documents.  The following day, the Board released a portion of the Merger Application to ICP but withheld certain documents, including a five-page document entitled "Confidential Exhibit 3: Discussion of Activities Relating to Sub-Prime Lending" ("Exhibit 3").  The released portion of the Merger Application states: "Wachovia has commercial lending relationships with select check cashing companies, pawnshops and payday lenders.  In recognition of the higher risk that these businesses present, the Credit Risk policy on lending to them is very restrictive. . . . Please see Confidential Exhibit 3 for information concerning these customers."  In its memorandum of law, the Board describes the contents of Exhibit 3 as follows:

> (i) the names of nine of Wachovia's commercial customers that make and/or purchase subprime residential mortgage loans; (ii) the specific amounts and some terms of Wachovia's credit facilities to these customers; (iii) descriptions of other banking services Wachovia provides to, or other relationships with, these customers; (iv) financial data on Wachovia's

banks' subprime lending practices on the requirements of the CRA.

> exposure and loan outstandings to commercial customers
> who engage in subprime lending; and (v) details
> regarding the due diligence Wachovia performs in
> evaluating particular lenders' requests for credit
> facilities.

The Board cited 5 U.S.C. § 552(b)(4), the fourth FOIA exemption

("FOIA Exemption 4"), which pertains to "commercial or financial

information obtained from a person and privileged or

confidential," id., as the basis for its denial of ICP's request.

On July 28, 2004, Lee sent another letter to the Board

appealing the Board's decision to withhold portions of the Merger

Application, including Exhibit 3, and renewing ICP's request for

the withheld documents.  This request was denied in a letter of

August 13, 2004 from Jennifer J. Johnson ("Johnson"), Secretary

of the Board.  Johnson reiterated that the requested documents

were exempt under FOIA Exemption 4.  Johnson's letter also stated

that no reasonably segregable nonexempt portion of the documents

at issue could be provided.  ICP filed an administrative appeal

on September 17, 2004.  The appeal sought only the release of

Exhibit 3.  On October 6, 2004, ICP's appeal was denied by Susan

Schmidt Bies, Governor of the Federal Reserve Board, again on the

basis that Exhibit 3 was exempt from disclosure under FOIA

Exemption 4.  Later that month, the Board approved the Wachovia-

SouthTrust merger.

Plaintiff filed the complaint in this action on October 21,

2004; it requests declaratory and injunctive relief.  On December

15, 2004, the parties made a joint request that a schedule be

established for defendant's summary judgment motion and

4

plaintiff's cross-motion.  The Board submitted a motion supported
by declarations of Elaine Boutilier and Andrew S. Baer ("Baer"),
both legal counsel for the Board, and of Michael P. Rizer, senior
vice president of Wachovia (the "Rizer Declaration").
Plaintiff's cross-motion was supported by a declaration from
Matthew Lee (the "Lee Declaration").

Discussion

     FOIA requires a federal agency to disclose records in its
possession unless they fall under one of nine enumerated and
exclusive exemptions.  5 U.S.C. § 552(a)(3)-(b); see also Dep't
of the Air Force v. Rose, 425 U.S. 352, 361 (1975).  The
statutory exemptions "do not obscure the basic policy that
disclosure, not secrecy, is the dominant objective of the Act."
Dep't of the Interior and Bur. of Indian Affairs v. Klamath Water
Users Protective Ass'n, 532 U.S. 1, 8 (2001) (quoting Rose, 425
U.S. at 361).  The exemptions are thus to be "given a narrow
compass."  Id. (quoting U.S. Dep't of Justice v. Tax Analysts,
492 U.S. 136, 151 (1989)); see also Nat'l Council of La Raza v.
Dep't of Justice, No. 04-5474-cv, --- F.3d ---, slip. op. at 2684
(2d Cir. May 31, 2005).  A district court has jurisdiction "to
enjoin the agency from withholding agency records and to order
the production of any agency records improperly withheld from the
complainant."  5 U.S.C. § 552(a)(4)(B).  The court "shall
determine the matter de novo . . . and the burden is on the
agency to sustain its action."  Id.; see also Fed. Open Market

Comm. v. Merrill, 443 U.S. 340, 352 (1979).

A court cannot grant summary judgment unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). Although the court is entitled to in camera review of disputed documents, see 5 U.S.C. § 552(a)(4)(B), on a summary judgment motion, "[a]ffidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." Carney, 19 F.3d at 812. FOIA also requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b).

FOIA Exemption 4 encompasses "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The Second Circuit has articulated a tripartite test for satisfying the requirements of the exemption: "The information for which exemption is sought must be a 'trade secret' or 'commercial or financial' in character; (2) it must be 'obtained from a person,' and (3) it

6

must be 'privileged or confidential.'"  <u>Nadler v. Fed. Deposit</u>
<u>Ins. Corp.</u>, 92 F.3d 93, 95 (2d Cir. 1996) (quoting 5 U.S.C. §
552(b)(4)).  Plaintiff concedes that Exhibit 3 is commercial or
financial in character and was obtained from Wachovia, a
corporation that qualifies as a person under the statute, <u>see</u> 5
U.S.C. § 551(2); the sole dispute is thus whether the information
contained in the document is "privileged or confidential" under
the statute.

      To qualify as "confidential" for purposes of 5 U.S.C. §
552(b)(4), the information "must have the effect either (1) of
impairing the government's ability to obtain information --
necessary information -- in the future, or (2) of causing
substantial harm to the competitive position of the person from
whom the information was obtained."  <u>Nadler</u>, 92 F.3d at 96
(quoting <u>Continental Stock Transfer & Trust Co. v. SEC</u>, 566 F.2d
373, 375 (2d Cir. 1977)).  This test is known as the "<u>National</u>
<u>Parks</u>" test because it was first articulated in <u>National Parks &</u>
<u>Conservation Association v. Morton</u>, 498 F.2d 765, 770 (D.C. Cir.
1974).  After examining the hearing record for the predecessor of
the bill that became FOIA, the <u>National Parks</u> court explained the
rationale for Exemption 4 as follows: "encouraging cooperation by
those who are not obliged to provide information to the
government and . . . protecting the rights of those who must."
<u>Id.</u> at 769.  In enacting Exemption 4, "Congress intended to
exclude the release of material which would customarily not be
released to the public by the person from whom it was obtained so

long as nondisclosure is justified by the legislative purpose which underlies the exemption." Nadler, 92 F.3d at 96 (citation omitted).

The Board argues that Exhibit 3 is exempt under both prongs of the National Parks test. The test is disjunctive, so to carry its burden, the Board need only establish that the criteria for one of the two prongs are met.

1.  Impairment of the Agency's Ability to Obtain Necessary
    Information in the Future

Under the first prong of the National Parks test, a court must determine whether the disclosure of the information at issue will impair the agency's ability to obtain similar necessary information in the future. National Parks, 498 F.3d at 770. The policy behind this prong is clear: "Unless persons having necessary information can be assured that it will remain confidential, they may decline to cooperate with officials and the ability of the Government to make intelligent, well informed decisions will be impaired." Id. at 767. When submission of information is mandatory, "there is a presumption that the Government's interest is not threatened by disclosure." Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 878 (D.C. Cir. 1992) (en banc);[2] see also National Parks, 498

---

[2] Notably, in Critical Mass, the Court of Appeals for the D.C. Circuit ruled that the application of the National Parks test was "confine[d] . . . to information that persons are required to provide to the government." Critical Mass, 975 F.2d at 872 (emphasis supplied). It applied a different standard to

F.2d at 770 ("Since [persons] are required to provide this . . .
information to the government, there is presumably no danger that
public disclosure will impair the ability of the Government to
obtain this information in the future.").  As the Court of
Appeals for the D.C. Circuit emphasized in <u>Critical Mass</u>,
however, even when the government has the power to compel the
production of information, the quality of the information
furnished in compliance with the government might suffer if the
furnisher of the information believes it may be publicly
disclosed.  "[W]hen dealing with a FOIA request for information
the provider is required to supply, the governmental impact
inquiry will focus on the possible effect of disclosure on its
<u>quality</u>."  <u>Critical Mass</u>, 975 F.2d at 878 (emphasis supplied);
<u>see also</u> <u>Africa Fund v. Mosbacher</u>, No. 92 Civ. 289 (JFK), 1993 WL
183736, at *7 (S.D.N.Y. May 26, 1993) ("[C]onfidentiality . . .
fosters the provision of full and accurate information.").  When

---

information voluntarily provided to the government; such
information could be withheld under FOIA if it "would customarily
not be released to the public by the person from whom it was
obtained."  <u>Id.</u> at 878 (citation omitted).  The Second Circuit
has explicitly held off on determining whether it would accept
the <u>Critical Mass</u> "amendment" of the <u>National Parks</u> test.
<u>Nadler</u>, 92 F.3d at 96 n.1.  Both parties recognize that the
<u>National Parks</u> test applies in this case, so the issue of the
applicability of the <u>Critical Mass</u> analysis need not be reached
here.  It should be noted, however, that when voluntarily
submitted information is at issue, the <u>Critical Mass</u> amendment is
merely a commonsensical extrapolation of the first prong of the
<u>National Parks</u> test: if a person, for any reason of substance,
would not ordinarily wish a particular type of information to be
disclosed to the public and truly has a choice whether or not to
submit the information to the government, that person will likely
choose not to submit such information if the government may
disclose it to the public.

information is furnished to the government voluntarily, the
government has an interest in "encouraging cooperation . . . by
persons having information useful to officials." National Parks,
498 F.3d at 768.  In sum, "when information is obtained under
duress, the Government's interest is in ensuring its continued
reliability; when that information is volunteered, the
Government's interest is in ensuring its continued availability."
Critical Mass, 975 F.2d at 878.

The Board contends that disclosure of Exhibit 3 would impair
its ability to obtain similar information in the future, thus
justifying the document's exclusion under the first prong of the
National Parks test.  The Board acknowledges that it "has the
statutory authority to require applicants to submit some
information regarding their relationships with subprime lenders
as part of the application process, and that it may disapprove a
proposal if the applicant fails to provide sufficient evidence to
show that statutory standards are met."[3]  The merger application

---

[3]The parties dispute the extent to which the CRA
independently requires the submission of information regarding a
bank's business with subprime lenders.  That the CRA compels a
bank to submit information as specific as loan terms and names of
clients engaged in subprime lending pursuant to a bank merger is
implausible, however.  The most concrete language in the CRA is
quoted supra note 1; the provision requires a general assessment
of a bank's record of "meeting the credit needs of the entire
community."  12 U.S.C. § 2903; cf. also Lee v. Bd. of Governors
of the Fed. Reserve Sys., 118 F.3d 905, 913 (2d Cir. 1997)
("[A]ny attempt to glean substance from the CRA is met with the
reality that the statute sets no standards for the evaluation of
a bank's contribution to the needs of its community.").
     The Board notes that it considered information about
Wachovia's involvement with subprime lenders "in assessing the
financial and managerial resources and future prospects of
Wachovia and SouthTrust," an analysis the Board is required to

instructions themselves, appended as Exhibit 1 to the Baer

Declaration, do not specifically require an applicant to detail

its relationships with subprime lenders, however.  Baer reports

that Wachovia provided Exhibit 3 in response to a telephone

conversation with a member of the Board's staff, in which the

staff member told a Wachovia representative, in essence, that the

Board "had taken into account applicants' relationships with

subprime lenders in assessing financial and managerial factors in

past applications in which public commenters had raised questions

regarding these relationships," leading Wachovia to believe that

the submission of such information might expedite the processing

of the Merger Application.  The Board in fact considered Exhibit

3 in determining whether Wachovia's relationships with subprime

lenders presented "significant legal, credit, or reputational

risk" to Wachovia.  Cf. 12 U.S.C. § 1842(c)(2).  According to the

Rizer Declaration, however, if Wachovia had known that the

information could be disclosed to the public, it might have

submitted a document that omitted some of the information

provided, including the identities of its clients and specific

loan terms and practices.[4]

---

undertake under the BHC Act, 12 U.S.C. § 1842(c)(2).  That the
Board had the power to compel at least some of the information
provided in Exhibit 3 is undisputed; the relevant question,
however, is whether it exercised its power to compel all
categories of information in Exhibit 3.  See infra note 5.

[4]The Rizer Declaration states specifically:
[I]f [Wachovia] had known that the information in . . .
Exhibit 3 would be made public, Wachovia likely would
have provided the Board with a more generic description
of its relationships with sub-prime lenders and its

Given the time-pressured merger application context, the telephone call suggesting that the Board would require information about Wachovia's dealings with such entities suffices to qualify at least a portion of the information provided as mandatory.[5]  Because of the stated concern regarding "financial and managerial factors," such a request would reasonably be construed to require, at the very least, two categories of information in the document withheld by the Board: aggregate "financial data on Wachovia's exposure and loan outstandings to

---

policies and practices with respect to financing sub-prime lenders; but would not have provided the Board with the actual names of its sub-prime lending clients, or the specific amount or terms of the credit facilities provided to those clients.

[5]There is some ambiguity in the case law as to whether the relevant query is whether the agency had the authority to compel the submission of particular information or whether it actually did compel the information.  <u>Compare</u> <u>Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.</u>, 244 F.3d 144, 149 (D.C. Cir. 2001) (framing the voluntary-mandatory distinction as one determined by an agency's "actual legal authority," where an agency had demanded information it had no authority to collect), <u>with</u> <u>Parker v. Bureau of Land Mgmt.</u>, 141 F. Supp. 2d 71, 78 n.6 (D.D.C. 2001) (stating in <u>dicta</u> that "[i]n addition to possessing the authority to compel submission, the agency must also exercise that authority in order for a submission to be deemed mandatory").  Equating an agency's statutory authority with the actual exercise of that authority in situations like this would effectively force the agency to be more assertive in the exercise of its authority in the future to obtain similar information, because applicants, knowing that their information was subject to public disclosure, would likely submit the bare minimum required.  Such an approach would discourage full and voluntary cooperation with the government and would make its operations more cumbersome.  Therefore, it is necessary to consider both the Board's legal authority to make a request and its actual assertion of its authority when assessing whether the information was obtained under duress.  The theoretical boundary of an agency's authority alone is an insufficient basis to qualify material provided to the agency as mandatory.

commercial customers who engage in subprime lending"[6] and
"details regarding the due diligence Wachovia performs in
evaluating particular lenders' requests for credit facilities,"
corresponding to numerals (iv) and (v) in the Board's description
of the information in Exhibit 3.

The telephonic request is too amorphous, however, to be
construed as a demand that Wachovia provide the identities of
specific clients, specific loan terms and amounts, and
descriptions of other services provided to those customers,
corresponding to numerals (i), (ii), and (iii).  These latter
categories of information were provided voluntarily by Wachovia.
According to the Rizer Declaration, in the ordinary course, a
bank would be unlikely to disclose client lists, loan terms, and
similar data to the public for fear of competitive harm.  ICP
does not dispute this,[7] although it argues that certain
information regarding the underwriting of securities must be
disclosed to the SEC, a point addressed <u>infra</u>.  Because a bank
would not voluntarily disclose information regarding client

_____

[6]That these are aggregate figures is confirmed in the Rizer
Declaration.

[7]ICP does point out that two banks have submitted
information about clients engaged in subprime lending pursuant to
merger applications without requesting confidential treatment.
In his Supplemental Declaration, however, Baer notes, citing
several examples, that "the general practice" among applicants
has been to request that the Board keep such information
confidential.  He further attests, and provides documentary
support to establish, that the information voluntarily disclosed
by the two banks cited as examples by ICP was much more limited
than that requested here, and that both banks did in fact request
confidential treatment for their unredacted or more detailed
submissions.

13

identities, loan amounts and terms, and other services provided
to clients, to mandate its disclosure in this instance would
impair the Board's ability to collect such information using
similarly worded requests in the future.  This information was
therefore properly withheld.

Because the information contained in numerals (iv) and (v)
was compelled, there is a presumption that the Board's ability to
obtain similar information will not be impaired in the future.
It is clear that the defendant has not rebutted this presumption.
The Board is unlikely to be hindered in its efforts to obtain
such data as the total exposure and loan outstandings contained
in category (iv), given the discrete, objective nature of the
numbers.  The likelihood that an agency will be impaired in
collecting mandatory information by an inability to assure
confidentiality diminishes significantly the more objective,
specific, and quantifiable the information required.  Compare,
e.g., Niagara Mohawk Power Corp. v. U.S. Dep't of Energy, 169
F.3d 16, 18 (D.C. Cir. 1999) (rejecting an agency's
uncontroverted but "conclusory" assertion of impairment because
"the data sought appears to take the form of hard, cold numbers .
. . , the fudging of which may strain all but the deliberately
mendacious"), with Wash. Post Co. v. U.S. Dep't of Heath and
Human Servs., 690 F.2d 252, 268 (D.C. Cir. 1982) (noting that the
disclosure form in question left "room for interpretation" in the
nature of the information required, and remanding for a
determination of the extent of the impairment of the government's

access to the information on this basis).

The analysis regarding category (v) is not as straightforward. There is certainly more room for interpretation available to persons required to submit information regarding the due diligence a bank performs in approving the extension of credit to subprime lenders, although a bank would have a strong incentive to set forth specific practices and criteria to prove that it was not exposing itself to undue risk in extending credit to subprime lenders. Also weighing toward a finding that the Board's ability to elicit similar information would not be impaired by the possibility of public disclosure is the fact that the Board has the power to reject a merger application if the information contained within it is insufficient, <u>see</u> 15 U.S.C. § 1842, and applicants are highly motivated to make detailed and thorough submissions to the Board to complete their merger plans as swiftly as possible. Because the burden of supporting non-disclosure is on the Board, and the Board has made no argument or showing directed specifically at item (v), this analysis is sufficient to find that the Board's future ability to collect information similar to that described under numerals (iv) and (v) will not be impaired.

Summary judgment is accordingly granted for defendants as to the client names, loan terms and amounts, and additional banking services noted in Exhibit 3, corresponding to numerals (i), (ii), and (iii) in the Board's description of the withheld materials excerpted above. This grant of summary judgment is subject,

however, to the exception of certain information that is already available to the public in SEC filings, as discussed _infra_ Part 3. The remaining categories of information -- Wachovia's aggregate exposure and loan outstandings to clients that engage in subprime lending and its due diligence practices relating to such clients -- must be analyzed under the second prong of the National Parks test.

2.    Substantial Competitive Harm to the Provider of the
      Information

Under the second prong of the National Parks test, information may be withheld by an agency if its disclosure is likely "to cause substantial harm to the competitive position of the person from whom the information was obtained." National Parks, 498 F.2d at 770. To make this determination, "the court need not conduct a sophisticated economic analysis of the likely effects of disclosure." Pub. Citizen Health Research Group v. Food & Drug Admin., 704 F.2d 1280, 1291 (D.C. Cir. 1983). It need only determine that the person who submitted the information faces both (1) actual competition and (2) a likelihood of "substantial" competitive injury if the information were released. Id. (citation omitted). ICP does not appear to dispute that Wachovia is in actual competition with other lenders; the controversy centers around the requirement that there be a likelihood of substantial competitive injury to Wachovia.

Before the Board's arguments can be addressed, it is necessary to determine whether the erosion of a small subset of a merger applicant's business can constitute "substantial competitive injury" under the test. ICP argues that, because neither bank involved in the merger engages in significant business with subprime lenders, the disclosure of Exhibit 3 cannot possibly cause it substantial competitive harm. It argues, in essence, that because Exhibit 3 contains information relating to only nine subprime lenders, while Wachovia's total consolidated assets were worth approximately $418 billion prior to the merger,[8] that it can be inferred that any competitive damage to Wachovia from the disclosure of information in Exhibit 3 would be minimal. At least one circuit has specified that competitive injury is to be measured in terms of the "relevant market." Lion Raisins Inc. v. U.S. Dep't of Agric., 354 F.3d 1072, 1079 (9th Cir. 2004). Moreover, courts routinely conduct their analyses without regard to the total size or composition of the business whose competitive interests are at stake. See, e.g., Public Citizen, 704 F.2d at 1290-92 (analyzing competitive injury to manufacturers of a particular product without regard to the overall composition of the manufacturers' businesses); Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp 2d 19, 29 (D.D.C. 2000) (assessing competitive injury on the basis of single transactions or projects). Accordingly, the potential for

_____

[8]For its part, SouthTrust had ten loans outstanding to pawn shops and similar entities, totaling $755,056, at the time of the merger, and consolidated assets of $53 billion.

competitive injury to Wachovia is assessed in respect to the relevant market, which the Board characterizes as commercial credit facilities for financial institutions.[9]

The Board raises no arguments that weigh squarely against the public release of information regarding Wachovia's aggregate loan outstandings and exposure to clients engaged in subprime lending or its due diligence practices in evaluating requests from such clients for credit, corresponding to numerals (iv) and (v) in the Board's description of Exhibit 3.  The Board makes one argument that is theoretically relevant to Wachovia's due diligence practices; it contends that the release of Exhibit 3 would put Wachovia at a disadvantage in bargaining situations because competitors would have knowledge of Wachovia's "business practices in pricing and underwriting commercial credit facilities, which the competitors could use to undercut Wachovia's efforts to gain new clients."  The argument centers, however, on "proprietary information regarding . . . relationships with . . . clients," none of which would be revealed if general information on Wachovia's due diligence practices were revealed.  The Board makes no showing that a generalized account of Wachovia's due diligence practices would cause Wachovia competitive harm.  It also makes no showing that the release of aggregate financial data would harm Wachovia.

_____

[9]Given that the Board's arguments are insufficient to warrant summary judgment in its favor, it is unnecessary to determine whether this characterization is precisely appropriate.

Summary judgment is accordingly granted to plaintiff regarding the information characterized under numerals (iv) and (v) of the Board's description of the withheld information: "financial data on Wachovia's exposure and loan outstandings to commercial customers who engage in subprime lending" and "details regarding the due diligence Wachovia performs in evaluating particular lenders' requests for credit facilities."

3.   Public Availability of the Information at Issue

ICP contends that certain underwriting-related information in Exhibit 3 is available in Securities and Exchange Commission ("SEC") filings.[10]  Such information could conceivably fall into one of the three Exhibit 3 categories that pertain to information that the Opinion has determined would otherwise be exempt under the first prong of the National Parks test.  The Rizer Declaration attests that Exhibit 3 indicates whether Wachovia "will act as a market maker or underwriter with respect to securities issued by some of its clients," although it does not state that Wachovia had participated in offerings that would be reflected in SEC filings as of the date Exhibit 3 was submitted.

If the requested information is already available to the

---

[10]In its original Memorandum of Law, ICP also argued that the Exhibit 3 information was publicly available in state filings pursuant to 9 U.C.C. § 310.  ICP appends eleven state U.C.C. filings to the Lee Declaration.  The Rizer Declaration submitted by the Board, however, counters that none of the customers listed in the U.C.C. filings is named in Exhibit 3, most likely because the U.C.C. filings are for small business loans transacted through Wachovia branch offices.  In its reply memorandum, ICP fails to press its argument premised on U.C.C. requirements.

public, it cannot be withheld under Exemption 4.  See Cont'l
Stock Transfer & Trust Co. v. SEC, 566 F.2d 373, 375 (2d Cir.
1977) (per curiam).  The party asserting that information is
publicly available bears the burden of producing evidence to that
effect, although the burden of persuasion remains on the agency.
See Occidental Petroleum Corp. v. SEC, 873 F.2d 325, 342 (D.C.
Cir. 1989).

     To meet its burden, ICP effectively asks the Court to take
judicial notice of SEC filing requirements.  The Board concedes
that "some references to Wachovia's role as an underwriter might
technically be public" but argues that if information is not
readily accessible, its "practical obscurity" would be
"sufficient to render it non-public for FOIA purposes," relying
on U.S. Dep't of Justice v. Reporter's Comm. for Freedom of the
Press, 489 U.S. 749, 762, 764 (1989) (considering the personal
privacy exemption under 5 U.S.C. § 552(b)(7)(c) regarding
information compiled for law enforcement purposes).  The issue in
Reporter's Committee was "whether the compilation of otherwise
hard-to-obtain information alters the privacy interest implicated
by disclosure of that information."  Reporter's Committee, 489
U.S. at 764.  It is difficult, however, to liken SEC filings,
which are subject to electronic search, to "courthouse files,
county archives, and local police stations throughout the
country," id., as suggested by the Board's analogy.  Moreover,
the Board would not have to search "all possible SEC filings by
subprime lenders to find references to Wachovia," as its reply

memorandum suggests; only nine clients are named in Exhibit 3, and, based on the Board's description of Exhibit 3, the fact that Wachovia had provided underwriting services for a given client would be indicated. Accordingly, if the fact that Wachovia has provided credit facilities to any of the clients listed in Exhibit 3 has already been disclosed to the public in SEC filings,[11] and Exhibit 3 itself indicates that underwriting services have been provided to one or more of the listed clients, such information in Exhibit 3 must likewise be disclosed to the extent it is already public.

4.    Reasonable Segregability

As noted above, the Board claimed in response to ICP's request that no reasonably segregable nonexempt portion of the documents at issue could be provided. Given that Exhibit 3 is a mere five pages long, it is assumed that the Board will have little trouble redacting all but the portions this Opinion has ruled nonexempt and that the segregability of the nonexempt information is therefore not an issue.

Conclusion

Summary judgment is granted for defendant as to client names, specific loan amounts and terms, and descriptions of other

---

[11]Cf. 17 C.F.R. § 229.508(a) (requiring that "each . . . underwriter having a material relationship with the registrant and . . . the nature of the relationship" be disclosed in a registration statement).

banking services provided to clients engaged in subprime lending, corresponding to numerals (i), (ii), and (iii) of the Board's description of the withheld contents of Exhibit 3, except to the extent that information is disclosed in SEC filings. Summary judgment is granted for plaintiff as to data regarding aggregate exposure and loan outstandings and due diligence practices, corresponding to numerals (iv) and (v) of the Board's description. The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
          July 19, 2005

                              _____
                                      DENISE COTE
                              United States District Judge